UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
Ronnie York, pro se,                          :
                                              :
                    Petitioner,               :        **MEMORANDUM AND ORDER**
                                              :
            -against-                         :        04-CV-1467 (DLI)
                                              :
Brian Fischer, Superintendent,               :
Sing Sing Correctional Facility,             :
                                              :
                    Respondent.               :
--------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

Petitioner Ronnie York ("Petitioner") filed this petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, on April 5, 2004, challenging his December 6, 1999 conviction in the Suffolk County Court for robbery in the first degree in violation of N.Y. Penal Law § 160.15(3). Petitioner was sentenced as a prior violent felony offender to a determinate sentence of twelve and a half years and is presently incarcerated. Petitioner requests that this court grant his petition on the grounds that: (1) the evidence presented at trial was legally insufficient to support his conviction, (2) the trial court improperly admitted a 911 tape as a present sense impression exception to the hearsay rule, (3) hypotheticals presented to jurors during voir dire were inappropriate, and (4) comments made by the prosecutor during opening and closing statements were improper. For the reasons set forth below, the petition is denied.


I.      **Facts**

At a jury trial, the prosecution presented four witnesses: Habib Qureshi, Izzy Martinez,

1

Detective James Mihalik, and Police Officer David Katzen. The following facts were developed during the trial. At approximately 2:15 a.m. on February 19, 1998, while Habib Qureshi was working the overnight shift at the 7-Eleven at 1074 Motor Parkway in Central Islip, NY, a man entered the store whom he recognized as a "regular customer who almost walks in every other day." (Tr. at 653.) He described the man as African-American, clean-shaven, with a shaved head, and wearing a loose gray jacket, dark gray pants, and blue sneakers. The man attempted to sell Mr. Qureshi a watch for ten dollars, explaining that he needed money for gasoline. The man exited the 7-Eleven and returned while Mr. Qureshi was helping a customer, to whom the man also tried selling the watch. The customer declined but gave the man a few dollars. The store was fully lighted and the man stood directly in front of the counter where Mr. Qureshi was working. Mr. Qureshi identified Petitioner as the man trying to sell the watch. (*Id*. at 653–59, 662–64, 706–08.)

Mr. Qureshi testified that he saw Petitioner go to a cream colored station wagon outside of the store in which he had previously seen Petitioner and another individual arrive to make purchases at the 7-Eleven. Though Mr. Qureshi testified that he did not see Petitioner arrive in this car on the night of the robbery, he saw the car around the same time as Petitioner entered the store and tried to sell the watch. Mr. Qureshi testified that he saw the car move across the street to a gas station after Petitioner exited the store the second time.[1] (Tr. at 660–61, 701, 707, 715.)

According to Mr. Qureshi, about fifteen minutes later, while he was cleaning the coffee machines behind the counter, Petitioner reentered the store and walked quickly towards him with an

---

[1] Mr. Qureshi's testimony about the car is somewhat unclear, as he testified on cross-examination that he saw Petitioner get out of the car at some point before the robbery. (Tr. at 730–31.) Mr. Qureshi testified he never saw Petitioner get in or out of the car once he saw it move across the street. (*Id*. at 740.)

L-shaped tire iron rod in his hand. Mr. Qureshi testified that Petitioner was wearing the same pants and a navy blue sweatshirt with a hood, though the hood did not obstruct Petitioner's face. (Tr. at 664.) Petitioner moved behind the counter where Mr. Qureshi was standing and told him, "Open the register. Give me the money. You will be dead." (*Id*. at 665.) Petitioner took around three hundred dollars from the cash register and hit Mr. Qureshi twice with the tire iron. Petitioner then told him, "Don't touch anything and move from here [or] you will be dead." (*Id*.)

Once Petitioner left the store, Mr. Qureshi hit the panic button and called 911 "[w]ithin seconds." (Tr. at 667.) The 911 tape, admitted as a present sense impression over defense counsel's objection that it was hearsay and bolstering, was played for the jury. (*Id*. at 685, 688, 695.) When police officers arrived, Mr. Qureshi told them that the man who had robbed the store was a regular customer. (*Id*. at 669.) Mr. Qureshi knew Petitioner lived at Coventry Village apartments because a friend and neighbor of Petitioner's, Izzy Martinez,[2] had fixed the radiator in Mr. Qureshi's car. Mr. Qureshi saw Petitioner at Coventry Village when he went there to have his car repaired and had asked Petitioner where to find Mr. Martinez. (*Id*. at 670.)

During the morning hours after the robbery, Mr. Qureshi accompanied police officers to Coventry Village twice—once with Officer Katzen to canvass the area for the cream colored station wagon and a second time to point out Petitioner's residence. (Tr. at 628, 672.) Detective Mihalik of the Suffolk County Police Department took a statement from Mr. Qureshi upon his return to the 7-Eleven after the first trip. (*Id*. at 673.) The afternoon of February 19, 1998, Mr. Qureshi, his boss, Det. Mihalik, and other officers, including Officer Katzen, viewed a surveillance tape that had

---

[2] Izzy Martinez testified that his fiancé was living at Coventry Village at the time of these events and that he visited often. (Tr. at 749.)

recorded the robbery at the 7-Eleven. (*Id*. at 629, 673, 778, 787.) Two versions of this tape were admitted into evidence: a fast version (the speed at which the surveillance tape was recorded) and a slower version. (*Id*. at 813–14.)

Izzy Martinez testified at Petitioner's trial that, on the night of February 18, 1998, Petitioner had attended a party he was hosting at Coventry Village, where his fiancé lives. At some point during the evening, Mr. Martinez gave Petitioner a few dollars to buy beer. (Tr. at 751.) Mr. Martinez testified that he owns a light-brown station wagon, which "usually everybody . . . [would use] . . . to go get [beer]," but that he had no knowledge whether Petitioner used it that evening and that Petitioner owned a gray car at that time. (*Id*. at 751–52.) The station wagon was described by Det. Mihalik as a cream, 1978 Buick station wagon with woodgrain side paneling. (*Id*. at 838.) Mr. Martinez testified that his car disappeared the night of the party and that he recovered it some time afterwards, shortly before police officers arrived to search it. (*Id*. at 754, 763–65.)

When Det. Mihalik first visited Coventry Village the morning of February 19, 1998, he did not see the station wagon. Det. Mihalik returned to Coventry Village later that afternoon and spoke to Mr. Martinez and Petitioner's wife, Belinda York. (Tr. at 834–36.) Det. Mihalik returned to the apartment complex on February 20, 1998 to search the station wagon, with Mr. Martinez's consent, and found inside it a navy sweatshirt and a crowbar. (*Id*. at 837–39, 841.) Det. Mihalik testified that the station wagon was not fingerprinted because officers had information that Petitioner had previously used the car, that the crowbar was not fingerprinted because it did not have a smooth surface, and that the sweatshirt was not analyzed for trace evidence because he did not think it would have any. (*Id*. at 849–51.) Det. Mihalik noted that he did not ask Mr. Qureshi to identify the sweatshirt or the crowbar because of the generic nature of the two items. (*Id*. at 852.) On re-direct

examination, Det. Mihalik testified that the 7-Eleven was not checked for fingerprints because of high store traffic. (*Id*. at 985–86.)

Police officers were unable to locate Petitioner until July 29, 1998 when, upon receiving an anonymous tip from Crime Stoppers, Det. Mihalik and two other officers found Petitioner at Coventry Village and arrested him. (Tr. at 854–55.) Det. Mihalik took Petitioner to an interview room at the Third Precinct in Bay Shore and read him his *Miranda* warnings and had him initial a rights statement. (*Id*. at 861–63.) Petitioner indicated that he understood his rights, both orally and in writing, waived his right to speak to an attorney, and agreed to make a statement as to what occurred on February 19, 1998. (*Id*. at 860, 864.) Det. Mihalik wrote the statement based on what Petitioner told him, and Petitioner signed it after reading it. (*Id*. at 865–66.) Det. Mihalik read the statement to the jury, which contained the following narrative:

> One night in February, 1998 I was out drinking and smoking crack for about five hours. I never really had a drug problem up until this time, but I got introduced to crack by friends who had smoked in an apartment right downstairs from where I live. My money ran out that night, so I drove my friend's car to 7–11 on Motor Parkway and Wheeler Road in Central Islip.
>
> At 7–11 I was trying to make some money by selling a watch. A guy gave me two dollars but I couldn't sell the watch. I was stressed for drugs. I left the store. I went back to my friend's car. I was desperate. I saw some clothes in the back of the car. I changed and went back into 7–11 and I took money from the cash register. I just wanted the money. I didn't want to hurt anyone. I ran back out of the store, got into the car and drove away.
>
> Sometime after this I sat down with my wife and discussed what happened that night. I came to terms with my drug problem. My wife helped me beat the drugs. I realize the importance of my family. I knew I would have to pay for what happened that night. I have since been working steady supporting my family. I am drug free. I am now at the Third Precinct giving this two page statement to Detective Mihalik. I have read the statement, given it freely, haven't been offered no threats or promises, and I swear it is all true.

(*Id*. at 866–67.) Det. Mihalik admitted that, at one point while taking the statement, he made an

intentional mistake—which Petitioner pointed out, corrected, and initialed—for the purpose of ensuring that Petitioner had read the statement. (*Id*. at 961–62.) Det. Mihalik did not record the taking of the confession in the prisoner activity log, in which he marked other movements made by Petitioner such as drinking water and smoking a cigarette. (*Id*. at 964.)

A jury found Petitioner guilty of robbery in the first degree on July 30, 1999 and he was sentenced on December 6, 1999 to a determinate sentence of twelve and a half years. Petitioner's primary defense at trial was identification, as he claimed that he was not the man with the navy sweatshirt who committed the robbery. Petitioner appealed his conviction to the New York State Appellate Division, Second Department, arguing that: the 911 tape, the tire iron, and the sweatshirt were improperly admitted into evidence; the prosecutor's voir dire questions improperly asked jurors to commit to scenarios similar to those presented at trial; the prosecutor made improper comments during opening and closing statements; the prosecution failed to prove Petitioner's guilt beyond a reasonable doubt; and Petitioner's sentence was excessive. By Decision and Order dated April 14, 2003, the Second Department addressed each of these arguments and affirmed Petitioner's conviction, holding as follows:

> The hearing court properly declined to suppress the contents of the vehicle that the defendant used to commit a robbery. On the day of the robbery, the defendant borrowed the vehicle from a friend and did not return it. The friend recovered the vehicle the next day, and the police searched the vehicle thereafter. There was no evidence that the defendant had the right to exclude others from the vehicle. Accordingly, the defendant failed to establish that he had a legitimate expectation of privacy in the vehicle and he lacked standing to challenge the validity of the search.
> Contrary to the defendant's contention, the trial court properly admitted the audiotape of a telephone call to the 911 emergency number under the present sense impression exception to the hearsay rule. Although the call was made after the perpetrator left the convenience store, the time delay was not sufficient to destroy the indicia of reliability upon which this hearsay exception rests.

The defendant's contention that the evidence was legally insufficient to support his conviction of burglary in the first degree is without merit. Viewing the evidence in the light most favorable to the prosecution, we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt.

The defendant's remaining contentions of prosecutorial misconduct during voir dire, the opening statement, and the summation either are unpreserved for appellate review or without merit.

The sentence imposed was not excessive.

*People v. York*, 757 N.Y.S.2d 495 (2d Dep't 2003) (citations omitted). The New York Court of Appeals denied Petitioner leave to appeal on July 10, 2003, *People v. York*, 100 N.Y.2d 590 (2003), and again, upon reconsideration, on September 30, 2003, *People v. York*, 100 N.Y.2d 626 (2003). Petitioner did not seek certiorari review before the U.S. Supreme Court or file any other post-conviction motions. Petitioner timely filed this petition for a writ of habeas corpus on April 5, 2004, arguing that: (1) the evidence presented at trial was legally insufficient to support his conviction, (2) the trial court improperly admitted the 911 tape as a present sense impression exception to the hearsay rule, (3) hypotheticals presented to jurors during voir dire were inappropriate, and (4) comments made by the prosecutor during opening and closing statements were improper.[3]

## II. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), where claims in state court were "adjudicated on the merits," the federal district court may grant a petition for a writ of habeas corpus only upon a finding that the state court proceeding

(1) resulted in a decision that was contrary to, or involved an unreasonable

---

[3] Because the Second Department stated that Petitioner's claims regarding the third and fourth grounds were "either . . . unpreserved for appellate review . . . or without merit," *York*, 757 N.Y.S.2d 495, these claims are valid and subject to federal habeas review. *See Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 810 (2d Cir. 2000).

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (O'Connor, J., concurring and writing for the majority in this part). The "unreasonable application" clause warrants federal habeas relief "if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. With regard to finding "unreasonable application" of Supreme Court precedent, "[s]ome increment of incorrectness beyond error is required. We caution, however, that the increment need not be great; otherwise, habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'" *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (quoting *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 889 (3d Cir. 1999)). Where the court reviews the evidence presented in a state court proceeding, "a determination of a factual issue made by a State court shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## III.    Exhaustion of Remedies in State Court

Respondent argues that Petitioner did not exhaust his remedies in state court because he

failed to cite and rely on federal law when appealing his conviction. Before a petition for a writ of habeas corpus may be granted, the petitioner must have "exhausted the remedies available in the courts of the State."[4] 28 U.S.C. § 2254(b)(1)(A). This requirement is "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman v. Thompson*, 501 U.S. 722, 731, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991). A claim is considered exhausted where the petitioner has "fairly presented" to the state court "both the factual and the legal premises of the claim he asserts in federal court." *Daye v. Attorney General of New York*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc). Even if a petitioner does not recite "chapter and verse of the Constitution" before the state courts, claims may be "fairly presented" by the following:

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Id*. at 194.

When Petitioner appealed his conviction, none of the arguments raised in his appellate brief cited to federal law. Only one of Petitioner's claims—that the evidence was legally insufficient to support his conviction—could be considered to have been fairly presented as a federal issue to the state courts. For this claim, the Second Department found the following:

> The defendant's contention that the evidence was legally insufficient to support his conviction of burglary in the first degree is without merit. Viewing the evidence in

---

[4] The Antiterrorism and Effective Death Penalty Act of 1996 provides exceptions to the exhaustion requirement where "there is an absence of available State corrective process" or where "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B)(i)–(ii). However, these circumstances are not present in the instant petition.

the light most favorable to the prosecution (*see People v. Contes*, . . . [467 N.Y.S.2d 349 (1983)]), we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt.

*York*, 757 N.Y.S.2d at 495. The *Contes* decision cited by the Second Department cites and quotes

*Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), a Supreme Court

decision articulating the test for an insufficiency of the evidence claim for habeas relief. *See*

*Copeland v. Walker*, 258 F. Supp. 2d 105, 118 (E.D.N.Y. 2003).

While this court has the option to stay the petition to allow Petitioner to exhaust his state

remedies, the Supreme Court has cautioned:

> [S]tay and abeyance should be available only in limited circumstances. Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court. Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless.

*Rhines v. Weber*, 125 S. Ct. 1528, 1535 (2005). Indeed, for mixed petitions such as the one

presented to this court, "[a]n application for a writ of habeas corpus may be denied on the merits,

notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the

State." 28 U.S.C. § 2254(b)(2). As set forth in detail below, Petitioner's claims do not appear to

have merit, and the court will proceed to address them.

### III.     Insufficiency of the Evidence

Petitioner has a heavy burden to overcome in challenging his conviction on the ground that

it was based on insufficient evidence. *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 811 (2d Cir.

2000). "[T]he relevant question is whether, after viewing the evidence in the light most favorable

to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.

The Second Department's decision, quoted above, was not "contrary to" and did not involve an "unreasonable application of . . . clearly established Federal law." Nor was it "based on an unreasonable determination of the facts in light of the evidence." The Second Department relied on *Contes*, which cites *Jackson*. Moreover, the evidence shows that a reasonable jury could have found the State's case against Petitioner proven beyond a reasonable doubt. Mr. Qureshi's testimony on the issue of identification gave little or no support to defendant's claim of misidentification. Indeed, Mr. Qureshi recognized Petitioner as a regular customer, had spoken to him at Coventry Village, saw him enter the 7-Eleven three times the night of the robbery, and spoke to him on that evening. Additionally, the jury saw a surveillance tape of the robbery, which captured Petitioner's image, and heard the contents of Petitioner's signed confession.

Petitioner argues that the confession was not corroborated as required by N.Y. Crim. Proc. Law § 60.50. However, this provision requires—in order to prevent a defendant from being convicted of a crime that did not occur—"the production of some proof, of whatever weight, that a crime was committed by someone." *People v. Daniels*, 37 N.Y.2d 624, 629 (1975). The confession may be corroborated by either direct or circumstantial evidence and it "need not even connect or tend to connect the defendant with the crime." *Id*. The confession was thus corroborated by the surveillance tape as well as by Mr. Qureshi's testimony.

Petitioner attacks Mr. Qureshi's identification of him, arguing that it was unreliable because it was cross-racial (Petitioner being African-American and Mr. Qureshi being Pakistani). Petitioner claims the identification was prone to inaccuracy because Mr. Qureshi was under significant stress

and may have been focusing on the tire iron instead of the perpetrator's face. Petitioner suggests that the jury was hasty in believing Mr. Qureshi's eyewitness account and should not have been influenced by Mr. Qureshi's level of confidence or certainty about the identification. Petitioner's argument is undermined by Mr. Qureshi's testimony that he had seen Petitioner several times before, both in and outside of the store. In any event, it is the jury's role—and not the court's—to make credibility determinations as to witnesses. *See Bossett v. Walker*, 41 F.3d 825, 830 (2d Cir. 1994).

In light of the overwhelming evidence of Petitioner's guilt, the lack of fingerprint and trace evidence is insufficient to overturn Petitioner's conviction. Nor is the fact that Mr. Qureshi never identified the sweatshirt or tire iron. These items were found in Mr. Martinez's car, who testified that Petitioner had attended his party at Coventry Village that evening. Though Mr. Qureshi did not see Petitioner arrive in the station wagon, he saw it around the same time as the robbery and recognized it from Petitioner's past trips to the 7-Eleven. Petitioner's conviction was based on sufficient evidence.

## IV.    Evidentiary Error

Generally, "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990)). To prevail on a theory of evidentiary error, a petitioner must "show that the error deprived [him] of a *fundamentally fair* trial." *Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004) (quoting *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988)).

Here, the Second Department found:

Contrary to the defendant's contention, the trial court properly admitted the audiotape of a telephone call to the 911 emergency number under the present sense impression exception to the hearsay rule. Although the call was made after the perpetrator left the convenience store, the time delay was not sufficient to destroy the indicia of reliability upon which this hearsay exception rests.

*York*, 757 N.Y.S.2d at 495.

Upon this court's own review, there is no indication that the evidentiary ruling was incorrect.

"[T]he present sense impression exception is available when the statement describes or explains an event or condition and was 'made while the declarant was perceiving the event or condition, *or immediately thereafter*.'" *People v. Vasquez*, 88 N.Y.2d 561, 575 (1996) (quoting *People v. Brown*, 80 N.Y.2d 729, 733 (1993)). Although "the description and the event need not be precisely simultaneous, since it is virtually impossible to describe a rapidly unfolding series of events without some delay between the occurrence and the observer's utterance," this

does not obviate the basic need for a communication that reflects a *present* sense impression rather than a recalled or recast description of events that were observed in the recent past. Without satisfaction of this requirement, the essential assurance of reliability—the absence of time for reflection and the reduced likelihood of faulty recollection—is negated and there is then nothing to distinguish the declaration from any other postevent out-of-court statement that is offered for the truth of its contents.

*Id*. Petitioner's main attack is that, based on timing indicated by the surveillance tape, which did not show Mr. Qureshi making the 911 call, Mr. Qureshi must have made the 911 call "almost a minute and a half after the conclusion of the robbery" (Pet. at 8A) instead of "[w]ithin seconds" (Tr. at 667). A delay of ninety seconds does not appear to be sufficient time for Mr. Qureshi to have reflected on what had just happened, though New York courts have held several minutes to be too long for a 911 phone call to be admissible under the present sense impression exception. *See, e.g.*, *People v. Robinson*, 728 N.Y.S.2d 421, 427 (1st Dep't 2001) (robbery victim's 911 call not a present sense

impression where victim called employer and waited two to four and a half minutes before placing 911 call). Yet there is no bright line test with regard to timing, and the court is not convinced that the 911 tape was improperly admitted, as there was at most only a ninety-second delay with no intervening events.

Nevertheless, even if the trial court erroneously admitted the 911 phone call, such error was harmless as there was ample evidence, most notably the surveillance videotape and Mr. Qureshi's testimony, to support Petitioner's conviction. Petitioner argues that the main issue at trial was identification, but the 911 audio—in contrast to video images and witness testimony—was not material to this issue. There is no showing that Petitioner was deprived of a fundamentally fair trial.

## V.      Allegedly Inappropriate Voir Dire

Petitioner claims it was error for the prosecutor, during voir dire, to ask jurors hypothetical questions presenting allegedly similar facts to those that needed to be proven at trial. It appears that neither the courts in this Circuit nor the Supreme Court have specifically discussed the constitutional contours of such a claim, but in *Hobbs v. Lockhart*, the 8th Circuit recognized: "Initially, we note that although there are no constitutional provisions directly addressing the use of hypothetical questions during voir dire, there may be circumstances where a party's manner of conducting voir dire renders a jury []partial and thereby triggers a Sixth Amendment violation." 791 F.2d 125, 129 (8th Cir. 1986). In the context of potential for prejudice because of jurors' preconceived notions about a defendant, the Supreme Court has stated:

> The constitutional standard of fairness requires that a defendant have "a panel of impartial, 'indifferent' jurors." Qualified jurors need not, however, be totally ignorant of the facts and issues involved. "To hold that the mere existence of any

preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." At the same time, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality."

*Murphy v. Florida*, 421 U.S. 794, 799–800, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975) (quoting *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961)) (internal citations omitted).

Juror impartiality is also at issue where jury charges include hypotheticals with facts similar to those that must be decided by the jury. *See, e.g.*, *United States v. Lara*, 47 F.3d 60, 65 (2d Cir. 1995) ("we have cautioned against the use in jury charges of hypotheticals that closely resemble the facts of a case"); *Johnson v. Artuz*, Nos. 00-CV-1332, 03-MISC-0066, 2003 WL 22964566, at *7 (E.D.N.Y. Sept. 3, 2003) ("A trial court is not precluded from supplying hypothetical examples in its jury instructions as an aid to understanding the applicable law. However, the hypotheticals must be fair and balanced, must not indicate to the jury that the court has an opinion as to the defendant's guilt or innocence, and must not present factual patterns that are strikingly similar to the instant case) (internal citations omitted); *People v. Johnson*, 616 N.Y.S.2d 371 (1st Dep't 1994) ("It is well settled that a trial court's use of a hypothetical with facts 'strikingly similar' to those in the case at hand is error ") (quoting *People v. Hommel*, 41 N.Y.2d 427, 430 (1977)).

Hypothetical questions during voir dire are not categorically improper, and, though New York courts have expressed disapproval of hypotheticals "containing detailed statements of fact, which counsel expects to establish, and presupposed rules of law to be charged by the court," *People v. Garrett*, 140 N.Y.S.2d 28 (2d Dep't 1955), courts are "vested with broad discretion to restrict the

scope of voir dire." *People v. Porter*, 641 N.Y.S.2d 283, 284 (1st Dep't 1996). Whether Petitioner

should succeed on his claim regarding allegedly inappropriate voir dire questions essentially depends

on whether Petitioner's Sixth Amendment right to trial "by an impartial jury" has been violated.

The first hypothetical question Petitioner challenges is the following:

> Let's say that a man's house gets burglarized, okay, and the Judge at the end of that
> case would instruct you that burglary would be unlawfully entering into the home of
> another person and intending to commit a crime in that home, okay? Let's say that
> a man comes into his house one night and he gets in the door and he looks, and he
> looks up and he sees the guy that works at the deli down the corner, he works behind
> the counter, the guy that he gets his coffee from let's say a couple of times a week
> from work, and he looks straight at him, knows who he is but he's just like frozen,
> and he sees in his hands that he's got the guy's television, the homeowner's
> television right in his hands and he takes the television and he runs out the door,
> okay? Now let's say a couple months go by and they finally catch up to this guy who
> worked in the deli, they couldn't find him for a couple of months. Now let's say they
> apprehend him and this case goes to trial and over the course of the trial the People
> are able to prove to you beyond a reasonable doubt that he unlawfully entered the
> home and that he intended to commit a crime in that home, he intended to steal
> something, but let's say because of the months that went by we could not produce
> any televison in court, the one that was stolen from the house, okay? . . . would you
> hold it against me that I could not produce that television in court?

(Tr. at 112–13.) While this hypothetical contained facts similar, but not identical, to Mr. Qureshi's

testimony about the robbery, the question focused on ensuring that jurors would understand that

producing the money Petitioner allegedly stole was not an element of the crime. Petitioner also

challenges the prosecutor's return to this hypothetical in asking: "So in my hypothetical with the

burglary, if the man comes back into his house and let's say he's been to this deli . . . he goes in there

three times a week, okay, and he comes into court and he says that was the guy, I know who he is,

I see him, would you be able to rely on his testimony as identifying the man who was in his home

that evening?" (*Id.* at 116–17.) In this question, the prosecutor was attempting to poll jurors on the

reliance of eyewitness testimony.

16

Petitioner criticizes the prosecutor asking a juror whether, in the context of someone making an identification of someone else, "you might want to know what the lighting conditions were when he saw them." (Tr. 119.) In another question regarding eyewitness testimony, the prosecutor asked whether, if there were "a couple of inconsistencies about maybe a shirt or whatever, would you be able to attribute that to nervousness of a witness or would you say they must not know who that person really was?" (*Id*. at 262–63.) Petitioner further objects to the following question, which was asked after two jurors stated that they would be hesitant to convict based on eyewitness identification alone: "Okay, let's say the witness, found them very candid and very credible, and you felt that because they had seen this witness on a number of occasions, you said hum, I'm pretty satisfied that they've seen him, and . . . say that you found that the person made a statement that they did it; would that be enough for you?" (*Id*. at 355–56.) The prosecutor asked separately whether the combination of eyewitness testimony and a confession would be sufficient for a conviction. (*Id*. at 357.) The prosecutor asked jurors similar questions about the weight of credible witness testimony alongside a confession. (*See id*. at 535, 540.)

These questions were all aimed at gaging jurors' ability to evaluate eyewitness testimony. Although Petitioner argues that the questions committed jurors to convicting him based on his confession and Mr. Qureshi's testimony, there is no indication that the jurors did not fairly evaluate the evidence when it was presented to them at trial or that jurors made credibility determinations based on the voir dire questions rather than the trial testimony and evidence. Jurors not only heard the confession and Mr. Qureshi's testimony, which was not discredited on cross-examination, but also watched a videotape of the robbery and heard testimony from Mr. Martinez regarding the station wagon Mr. Qureshi testified was involved in the robbery. In light of the evidence presented at trial,

the voir dire questions did not deprive Petitioner of a trial by an impartial jury.

VI.    **Prosecutorial Misconduct**

The appropriate standard of review for a habeas corpus petition involving prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power." *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990) (citing *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986)). The petitioner must show the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974). Only comments by a prosecutor that constitute "egregious misconduct . . . amount[ing] to a denial of constitutional due process" are sufficient for showing prosecutorial misconduct. *Floyd*, 907 F.2d at 353 (citing *Donnelly*, 416 U.S. at 647–48).

Standing alone, inappropriate prosecutorial comments are insufficient to overturn a conviction. *Duran*, 322 F. Supp. 2d at 259 (citing *United States v. Young*, 470 U.S. 1, 11, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985)). Indeed, "remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly." *Young*, 470 U.S. at 12. Assessing the impact of prosecutorial misconduct includes analyzing the severity of the comments and whether the trial court took any curative measures. *See United States v. Melendez*, 57 F.3d 238, 241 (2d Cir. 1995). Overall, the

petitioner must show that prejudice ensued.[5]

Petitioner first objects to the prosecutor highlighting during his opening statement that Petitioner was indicted by a grand jury and reading a portion of the indictment stating that "defendant, on or about February 19th, 1998 . . . forcibly stole certain property from Habib Qureshi, and . . . used, or threatened the immediate use of[,] a dangerous instrument." (Tr. at 611.) A prosecutor's mention that a grand jury returned an indictment is not "necessarily improper" and, alone, does not violate the right to a fair trial. *See Taylor v. Kentucky*, 436 U.S. 478, 487, 98 S. Ct. 1930, 56 L. Ed. 2d 468 (1978). Here, the effect of the prosecutor's statement is further lessened by the fact that, although a curative instruction was not issued after the opening, in charging the jury, the court provided instruction that an indictment is not evidence and is "merely a written accusation or charge levied against the defendant." (*See* Tr. at 1170.) *Cf. Taylor*, 436 U.S. at 488 n.15 (mention of indictment, along with other prosecutorial misconduct, caused prejudice where the "the trial court also refused petitioner's request for an instruction that the indictment was not evidence").

Petitioner next argues that the prosecutor improperly commented during summation, "Now, counsel objected and didn't want you to hear what the content of that conversation [Det. Mihalik had with Petitioner's wife and Izzy Martinez] was." (Tr. at 1128.) Yet, upon this comment, the court

---

[5] While it is well-settled that federal habeas relief is only available for prejudicial errors, the Supreme Court has pronounced two different harmless error tests. *See Brown v. Keane*, 355 F.3d 82, 91 (2d Cir. 2004). Under *Brecht v. Abrahamson,* the test is "whether the error had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). The Court in *Chapman v. California*, on the other hand, set forth a standard of "harmless beyond a reasonable doubt." 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Post-AEDPA, the Second Circuit has not yet decided whether the appropriate harmless error standard is the *Brecht* test or "whether the state court's decision was 'contrary to, or involved an unreasonable application of' *Chapman*." *Brown*, 355 F.3d at 91 (quoting *Noble v. Kelly*, 246 F.3d 93, 101 n.5 (2d Cir. 2001)); *see also Benn v. Greiner*, 402 F.3d 100, 105 (2d Cir. 2005) (noting that, as a third possibility, the *Chapman* test could be applied directly).

immediately issued a curative instruction: "Please disregard that comment about what the defense attorney did or did not do." (*Id*.) Petitioner similarly argues that the prosecutor's "didn't want you to hear" comment could apply to other testimony to which defense counsel had objected. However, the trial court again gave the jury curative instructions when, for example, Det. Mihalik testified that the issue of Petitioner's drug use "was indicated from Belinda York." The trial court sustained defense counsel's objection and instructed the jury, "Stricken. The jury is to disregard." (*Id*. at 991.) Moreover, when charging the jury, the court instructed: "In the course of the trial[,] questions were asked at times as to which objections were sustained. Whether these matters seemed at any time to be trivial or important is of no concern. They are not in the case and you must not be influenced by them, nor shall any inference be drawn by you with respect to any of them. Decide the case solely upon the competent evidence before you . . . . " (*Id*. at 1163.) The trial court's curative and final instructions to the jury thus diffused any possible prejudice to Petitioner.

Though Petitioner claims prejudice resulted from the prosecutor vouching for the evidence during summations, the trial court explained that both counsel had committed the same error: "So both of you vouched for what you wanted to vouch for. It was evenly matched, and therefore I didn't interject myself." (*Id*. at 1151.) The prosecutor's comments that the defense had "throw[n] a lot of smokescreens" also cannot be considered to have infected Petitioner's trial with unfairness. (*Id*. at 1144.)

Moreover, as has been discussed above, there was ample evidence supporting Petitioner's conviction. Therefore, the comments Petitioner complains of, all of which were followed by curative instructions, are insufficient to meet the standard for overturning a conviction based on prosecutorial misconduct. Under either the *Brecht* or the *Chapman* standard, any error caused by the prosecutor's

comments was harmless.

**VII.   Conclusion**

The petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied.  Petitioner is denied a certificate of appealability as he fails to make "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see* FED. R. APP. P. 22(b); *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003); *Luciadore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000).   Any appeal from this order would not be taken in good faith.  *See Coppedge v. United States*, 369 U.S. 438, 444, 82 S. Ct. 917, 8 L. Ed. 2d 21 (1962).

SO ORDERED.

DATED:        Brooklyn, New York
                     July 21, 2006

_____/s/_____
            DORA L. IRIZARRY
        United States District Judge